In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-3838 & 14-3298

MARYLEE ARRIGO,

*Plaintiff-Appellant*,

*v.*

JAY E. LINK and LINK STOP, INC.,

*Defendants-Appellees*.

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 13 CV 00437 and 12 CV 00700 — **Barbara B. Crabb**, *Judge*.

ARGUED MAY 26, 2015 — DECIDED SEPTEMBER 6, 2016

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Marylee Arrigo maintained in this lawsuit that she was fired from her job for taking or requesting leave under the Family and Medical Leave Act. The jury did not agree, and she appeals. Arrigo contends that her supervisor's notes from a meeting he requested before she returned from medical leave were wrongly excluded from trial. We conclude that the district court did not abuse its discretion when it found the notes not relevant to the issues at trial, as

Arrigo's only claim at trial was under the FMLA and the notes do not suggest displeasure with Arrigo's use of leave. She also argues that the district court erred when it denied her motion for leave to amend to add claims under Title VII and the Americans with Disabilities Act, but she has not shown good cause for filing the motion after the deadline. Finally, Arrigo maintains that the district court should not have dismissed a second lawsuit that she filed which alleged the same Title VII and ADA claims for which she unsuccessfully sought leave to amend in the first suit. Allowing the second lawsuit to proceed would undercut our decision to uphold the denial of leave to amend to add these very claims. Therefore, we affirm the judgment of the district court.

## I. BACKGROUND

Marylee Arrigo was a long-time employee of Link Stop, a gas station and convenience store in northwest Wisconsin owned by David Link. She first began working there from 1999 to 2002, took a break for school, and then resumed working in 2004, this time as Link Stop's bookkeeper. Over time, Arrigo took on bookkeeping for several of Link's other businesses as well, including Grandma Link's Restaurant & Lounge, Ashland Lake Superior Lodge, and Gordon Pines Golf Course. She also acquired some management responsibilities, and her duties included paying bills and invoices and generating monthly financial reports.

On Saturday, September 11, 2010, Arrigo suffered a severe anxiety attack and was taken by ambulance to the emergency room. Arrigo called Lydia Cook, Link's long-time assistant, and informed her that she needed a period of medical leave. Link later told her to take the time she needed, and Arrigo

was paid during her leave. Her doctor authorized her to return to work on September 27, 2010. When she called Cook to inform her of her return-to-work date, Cook told Arrigo to call Link, which she did. He was out of town and said he wanted to meet with her when he returned and before she began working.

Link testified at trial that he asked Arrigo to provide a return-to-work certification from her doctor before returning to work. When she failed to do so, he briefly delayed her return so he could meet with her before she returned to work. Arrigo and Link met on Friday, October 8, 2010. Link took handwritten notes during the meeting, which he titled "10/8/10 Leave of Absence Medical Review." During the meeting, Link asked Arrigo for details about her condition, diagnosis, and treatment. Arrigo answered his questions and divulged information including that she had been prescribed medications and ordered to attend counseling. Link's handwritten notes from the meeting state:

> _10-8-10 Leave of Absence Medical Review_
>
> _Marylee  -Hospital Sept. 11ᵗʰ Doctor (Ambulance)_
>
> _-known since April/Doctor says one year_
>
> _Anixity [sic] issue_
>
> _-Panic attack – cold/sick/electric feeling_
>
> _-Stress related_
>
> _-Saratonin [sic] lacking (mood chemical) – chemical imbalance_
>
> _-Treating with – 'Paxil Drug'_
>
> _-Former Zantax drug – (not for two weeks) – very addictive_

*Today feels normal*

*Exhausted – 12hrs/day/7 days a week*

  *-Learn to relax – like her father – brain does not shut off.*

  *-Sleeping issues for five years*

  *-Kelly's mother's death*

*Treatment*

   *-Paxil working quickly*

  *-Released to go back to work*

   *-Physical therapy – every three weeks – 'or as needed'*

   *-Rest*

   *-Sleeping aid*

| | |
|---|---|
| *Suggest to stop smoking* | *File Personell [sic]* |
| *Suggest exercise* | *"Marylee"* |
| | *JLJ* |
| | *11-5-10* |

The next page had three lines, which said:

   *-Need to change Christa – more training*

   *-Quit being a control freak*

*<u>Idea's [sic] to Change</u>*

Arrigo returned to work on Monday, October 11, 2010. She says Link told her about several changes he was implementing, including her office relocation to the basement of his office/residence at Bond Lake. According to Arrigo, he also said that she would be moving away from her management role and focusing on financial reports. Arrigo maintains that Link treated her differently when she returned from medical leave; for example, she says, he no longer greeted her upon her arrival, and he instituted new work requirements. Link also told Arrigo she needed to complete the monthly financial reports by the first of the following month, something he conceded "can't be done."

About six weeks after her return to work, on November 22, 2010, Arrigo was in a car accident on the way to work. She was not seriously injured but went to the hospital, and she learned there that she was pregnant. As a result, her doctor directed her to stop taking her anti-anxiety medication. She suffered withdrawal symptoms that landed her in urgent care on a Saturday, and the doctor told her to take two days off work the following week. According to Arrigo, she informed Link that Monday that she was pregnant, to which he responded that she had missed enough work and needed to get back to work. Link, however, says Arrigo did not tell him then that she was pregnant. Arrigo returned to work the following day.

In early December, Link issued Arrigo the first written performance warning she had received during her time working for him. The warning cited untimely financial reports, which Arrigo maintains was partly because of her medical leave a few months earlier. Link and Arrigo met about the memorandum, and Link says they discussed a number of

things that in his view needed improvement: work hours, availability, attitude, insubordination, getting along with other employees, and the timeliness of her financial reports. The memorandum expressed optimism that Arrigo would improve, stating in part, "To be realistic, I estimate that such improvement will take no time at all to become visible. Given your excellent performance record in the past, there is no reason to assume anything but success."

On Monday, January 24, 2011, Arrigo emailed Link that her year-end reports would be completed by Wednesday and that she and another employee intended to take Thursday and Friday off from work. Link responded that day in an email: "Marylee, a few days notice for two of my staff to take time off at the same time is not fair. We have a process in place to take time off, you know. If there is some emergency, please advise … ." Link wrote the next day, "Looking back, it seems you do not have any vacation time. Are you requesting time off without pay?" Arrigo responded that she had three weeks of vacation time. She did not hear further from Link.[1] Arrigo did not work that Thursday and Friday. The following Monday, Link terminated Arrigo's employment.

Arrigo filed administrative complaints in Wisconsin asserting violations of the Wisconsin state Family and Medical Leave Act and pregnancy and discrimination claims under Wisconsin state law. She also filed a charge of discrimination with the EEOC asserting pregnancy and disability claims under Title VII and the ADA. While Title VII and ADA claims require a right-to-sue letter before such claims can be asserted

---

[1] Arrigo then followed up with Cook, who said, "If I were you, I would just go." The jury did not hear about this exchange with Cook.

in federal court, *Houston v. Sidley & Austin*, 185 F.3d 837, 838–39 (7th Cir. 1999), the FMLA has no comparable requirement. Arrigo asked the defendants to agree to toll the statute of limitations on her FMLA claims until the conclusion of the administrative proceedings, but they declined.

Arrigo filed suit in federal court in September 2012 asserting that she was fired for taking federal FMLA leave. Six months later, she moved for leave to amend her complaint to add pregnancy and disability claims under Title VII and the ADA. The district court denied that request, finding that Arrigo's motion, filed four months after the deadline for amending pleadings, came too late. Arrigo filed a separate federal suit in September 2013 alleging the same Title VII and ADA claims, and the district court granted the defendants' motion to dismiss the second suit.

The first case proceeded to trial in the spring of 2014 on the FMLA interference claim. The district court granted the defendants' request to exclude Link's handwritten notes from the October 8 meeting, as it found them irrelevant to Arrigo's claims. The parties agreed before trial that Arrigo's anxiety condition and her medication withdrawal in November 2010 were serious health conditions that entitled her to FMLA leave.

The jury heard about other direct reports of Link who had taken medical leave without being retaliated against or terminated. Cook took a four or five week medical leave in 2005, a medical leave in 2006, and a third medical leave in 2012. She also took maternity leaves of sixteen and twelve weeks while working for Link. Marilyn Lehman took frequent medical leaves to care for her newborn daughter in 2007, to care for her sick mother in 2011 and 2012, and to care for her husband

following surgery in 2013. Michael Bobin, a previous Link Stop manager, took a four or five month medical leave due to a heart condition. The jury also heard about performance issues that Link believed existed with Arrigo.

After a five-day trial, the jury returned a verdict against Arrigo. It answered "no" to the question of whether she had proven that one of the reasons Link terminated her was that she took or requested medical leave in the fall of 2010 or that she had notified him that she needed to take maternity leave. So the jury did not reach the question of whether the defendants had proven Link would have terminated Arrigo even if she had not taken or requested medical leave or notified him she would need to take medical leave. Arrigo appeals.

## II. ANALYSIS

### A.  Exclusion of Evidence from Trial

We turn first to Arrigo's contention that the district court wrongly excluded evidence from trial that was relevant to her FMLA claim. The FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any rights provided under the FMLA. 29 U.S.C. § 2615(a)(1). One of these is an employee's right to take twelve weeks of unpaid leave during a year for certain medical reasons. *Id.* § 2612. Another is the right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. *Id.* § 2614(a)(1). Arrigo maintained at trial that she was fired for taking FMLA leave, requesting such leave, or notifying her employer that she would be needing leave.

Evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. We review the district court's evidentiary rulings during trial or beforehand on motions in limine for an abuse of discretion. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). In doing so, "[d]ecisions to exclude evidence are given considerable deference." *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). And even if the district court erred in excluding evidence, "[a] new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Id.*

In this case, the parties agreed, and the jury verdict form reflected, that the threshold question the jury had to answer was whether Arrigo had "proven by a preponderance of the evidence that one of the reasons that Defendant Jay E. Link terminated her was that she took or requested medical leave in the fall of 2010 or that she had notified Defendant Link that she would need to take maternity leave."[2] Only this FMLA claim was at issue in the trial. There was no claim under the ADA. Arrigo contends that the district court kept out evidence that was relevant to the question the jury had to answer.

---

[2] If the jury answered "yes," it would have then had to answer whether the defendants had proven that "Defendant Link would have terminated Link even if she had not taken or requested medical leave in the fall of 2010 or had not notified him that she would need to take maternity leave." Because the jury answered "no" to the first question, it did not reach the second question.

### 1. Notes from October 8 Meeting

Arrigo first argues that Link's handwritten notes from the October 8 meeting were wrongly excluded. The district court ruled that the notes were irrelevant to Arrigo's claim at trial, explaining: "This exhibit is not relevant because it doesn't go to what [Link's] frustration was allegedly about her having taken any FMLA leave. Now there might have been a great claim about his antipathy toward people that have mental problems, but that's not this lawsuit." The effect of the ruling excluding the October 8 meeting notes from trial was that Arrigo also could not introduce evidence that the meeting notes had been placed in her personnel file, which was the first time notes had been placed in her file during her time there.

In contending that the notes were relevant in this trial, Arrigo first argues that the notes are evidence of Link's anti-FMLA animus. She maintains they show he was evaluating her because of her FMLA leave since the purpose of the meeting was to "review," per Link's handwritten "Leave of Absence Medical Review" title on the notes, Arrigo directly following her leave. We have said before that "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination." *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 443 (7th Cir. 2014) (quotations omitted) (finding word "black" written on file direct evidence of discrimination in race discrimination claim). But the notes do not suggest that she was being evaluated for having taken leave. The notes contain details about Arrigo's anxiety, medications, and symptoms, but not about any leave. The only

time the word "leave" appears on the notes is in the title (and it is factually true that Arrigo had taken leave). There is nothing in the notes discussing the leave itself or anything that foresees the potential for future leave.

In a similar vein, Arrigo argues that the evidence was also relevant because it demonstrated that the leave was weighing on Link's mind. She contends a jury could infer from the notes and other evidence that Arrigo's leave concerned Link enough that he wanted a record of it, that Link evaluated Arrigo differently following her leave, and/or that the leave impacted how he thought about Arrigo. She also argues that a jury could infer from Link's questions about Arrigo's anxiety that he was concerned about future leave. Arrigo does not, however, identify any part of the notes that demonstrate concern Link had about her use of leave. The notes focus exclusively on the details Arrigo provided about her mental health, including her anxiety attack, diagnosis, and her current condition. They do not say anything about, for example, whether Arrigo's doctor expected that she might experience another anxiety attack requiring additional time off in the future, nor do they contain any mention of the expected duration of any future medical leave.

Arrigo also points to the last line in the notes, which states, with nothing below it, "Idea's [sic] for Change." Although Arrigo argues that the FMLA does not permit changing of duties after leave, the meeting notes do not suggest that Link was contemplating any change of duties. There is nothing underneath the phrase to which she points, and no indication that the "change" concerns a change in duties rather than, for example, lifestyle issues such as learning to relax and exercise that are mentioned elsewhere in the notes.

Arrigo also argues that the notes demonstrate Link delayed her return to work in a veiled attempt to interfere with her use of leave, and that the notes are therefore impeachment of Link's trial testimony that he delayed Arrigo's return because she had not provided the required certification from her doctor. We agree with Link that the notes do not impeach this testimony because they do not suggest that Link's true reason for delaying Arrigo's return was anything other than what he testified: Arrigo had not produced a certification, so he wanted to meet with her.

Arrigo's rationale for wanting the notes admitted further supports the conclusion that the district court did not abuse its discretion when it excluded the notes. Federal Rule of Evidence 403 warns against the "danger of … unfair prejudice, confusing the issues, undue delay, [and] wasting time." Arrigo's counsel told the district court that he wanted to use the notes to argue to the jury that Link had a bias against Arrigo's particular serious medical condition. Arrigo's counsel said, for example: "I think these notes demonstrate that precisely what we've been arguing about is true, that he had a bias against this particular condition, this particular serious medical condition." But any bias Link had toward Arrigo's medical condition was not at issue in this trial, where the only claim was that Link fired Arrigo for using or wanting to use medical leave. There was no claim at trial that Link discriminated against her on the basis of her anxiety. That is, the issue was not whether Link had a bias against a particular condition, but whether Link had a bias toward the use of leave. So the district court did not abuse its discretion when it excluded the notes.

### 2. Other Evidentiary Issues

Arrigo maintains the district court excluded multiple other pieces of relevant evidence. She argues that she should have been allowed to offer additional testimony regarding her January 2011 vacation request, and specifically that she spoke with Cook, who encouraged her to take the vacation even without Link's approval. Before the district court, Arrigo sought to introduce this testimony to show Arrigo's "state of mind at the time she took the vacation. That's all." Although there was no evidence Link was aware of the conversation, Arrigo argued that because Link and Cook spoke about many business-related matters, the jury could assume that Cook must have disclosed this conversation to him as well.

The relevant question is what Link believed when he decided to fire Arrigo. "The proper inquiry mandates looking at [the plaintiff's] job performance through the eyes of her supervisors at the time of her suspension and termination." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). The pretext inquiry asks not whether an employer correctly believed an employee was performing poorly, but rather whether the employer honestly believed so. *Liu v. Cook Cty.*, 817 F.3d 307, 316 (7th Cir. 2016). So Arrigo's state of mind and whether Arrigo believed she could take the vacation do not matter here. In addition, with no evidence that Cook had disclosed the conversation in question to Link, it was not an abuse of discretion for the district court to preclude testimony on the subject.

For similar reasons, the district court did not abuse its discretion when it excluded testimony from a manager and two of Arrigo's subordinates who she says would have testified about her positive performance as a general manager of Link

Stop. The district court limited their testimony about Arrigo's performance and their opinions of it to what they communicated to Link and Cook. Again, these employees' belief as to whether Arrigo was a good manager are not relevant here. Link's honest belief is what matters. And the question is not whether Link was correct to believe that Arrigo performed poorly, but rather whether he honestly believed that she did. *See Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004).

Arrigo also contends that she was wrongly precluded from introducing evidence about her arrival and regular hours. But Krista Schaaf testified that she and Arrigo drove to work together at 9:00 a.m., that they typically arrived at the Bond Lake office around 10:30 a.m., and that Link saw them when they arrived. The district court precluded testimony from Schaaf about how Schaaf and Arrigo spent the time between 9:00 a.m. and their arrival at the Bond Lake office, but Arrigo testified about how she spent the time. She said she arrived at Grandma Link's Restaurant between 9:00 and 10:00 a.m., would then go to Link Stop, and would arrive at the Bond Lake office around 10:00 or 11:00 a.m. Precluding further testimony on the subject was not an abuse of discretion.

While Arrigo also argues that she should have been permitted to testify further about her condition, her treatment, and the underlying reasons for her FMLA leave, the district court did not abuse its discretion here either. Arrigo testified to the jury that she had an anxiety attack that resulted in emergency medical care, had a prescription for anxiety medication, and was instructed by her doctor to take some time away from work. Significantly too, the parties had stipulated before

trial that Arrigo's anxiety condition was a "serious health condition" under the FMLA that entitled her to leave, and the jury was instructed on this fact. The district court acted within its discretion when it excluded additional testimony about Arrigo's condition when the only issue for the jury was whether Link fired her because of her use of protected leave.

Arrigo's brief contains a list of other evidence that she believes was improperly excluded from trial as well. We do not find that the exclusion of any of the other evidence warrants a new trial. *Cf. United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (perfunctory and undeveloped arguments are waived).

### B. Denial of Leave to Amend Complaint to Add Title VII and ADA Claims

Arrigo's complaint in federal district court did not include claims under Title VII or the ADA. Four months after the deadline for amendment of the pleadings that had been jointly proposed by the parties, Arrigo filed a motion for leave to amend her complaint to add claims that the defendants had discharged and discriminated against her on the basis of her sex and pregnancy, in violation of Title VII, and also on the basis of a disability, in violation of the ADA. We review the district court's denial of that motion for an abuse of discretion. *Bell v. Taylor*, 2016 WL 3568139, at *3 (7th Cir. July 1, 2016). We may affirm the district court's denial of a motion for leave to amend on any ground that is supported by the record. *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 773–74 (7th Cir. 1995).

Delay alone is usually not sufficient to deny a motion for leave to amend. *See Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 793 (7th Cir. 2004). But when the motion for leave to

amend is filed after the deadline for such motions, "the generous standard in Rule 15(a)(2) for allowing amendments 'is in some tension with' Rule 16(b)(4), which governs scheduling orders and requires a showing of good cause to justify modifying time limits." *Adams v. City of Indianapolis*, 742 F.3d 720, 734 (7th Cir. 2014) (quoting *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011)); *see* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). "To amend a pleading after the expiration of the trial court's scheduling order deadline to amend pleadings, the moving party must show 'good cause.'" *CMFG Life Ins. Co. v. RBS Secs., Inc.*, 799 F.3d 729, 749 (7th Cir. 2015) (quotation omitted). We have upheld denials of motions for leave to amend filed months after the deadline where the plaintiffs did not demonstrate good cause. *See Bell*, 2016 WL 3568139, at *4 (eight months); *Adams*, 742 F.3d at 733 (six months).

Arrigo explains that she did not seek to add Title VII and ADA claims earlier because she was pursuing her sex and disability discrimination claims at the state administrative level, along with claims under Wisconsin's Family and Medical Leave Act. Arrigo says she learned in early 2013 that the defendants did not employ a sufficient number of employees to be covered by Wisconsin's FMLA (the defendants assert that they had argued since 2011 that the Wisconsin FMLA did not cover them), and that she then withdrew all her claims that were pending before the state administrative forum. She asked the defendants to stipulate to allowing her to add Title VII and ADA claims in the instant lawsuit, but they declined. She then filed a motion requesting leave to amend in the district court to add federal claims to the current lawsuit. She maintains that all along, she was trying to efficiently bring her claims.

We have addressed similar situations before, when for example a plaintiff argues that he was not able to obtain a right-to-sue letter from the EEOC, *see* 42 U.S.C. § 2000e-5(f)(1), before the statute of limitations expired on another claim. And we have said, for many years now, "Plaintiffs in the same situation as [here]—seeking relief under § 1983 and Title VII or other federal employment discrimination statutes for the same adverse employment action—routinely ask district courts to stay the first lawsuit until they obtain a right-to-sue letter." *Czarniecki v. City of Chicago*, 633 F.3d 545, 550 (7th Cir. 2011); *see Barr v. Bd. of Trs. of W. Ill. Univ.*, 796 F.3d 837, 840 (7th Cir. 2015); *Palka v. City of Chicago*, 662 F.3d 428, 438 (7th Cir. 2011); *Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F.3d 337, 339 (7th Cir. 1995) (stating plaintiff "could have delayed the filing of his first suit or requested that the court postpone or stay the first case. What he cannot do, as he did here, is split causes of action and use different theories of recovery as separate bases for multiple suits."); *Herrmann v. Cencom Cable Assocs.*, 999 F.2d 223, 225 (7th Cir. 1993).

Arrigo could have taken the same course here. She knew about her sex and discrimination claims from the outset but gives no good cause for why she did not seek a stay, a course of action we have suggested for many years. Arrigo's decision not to bring a motion for leave to amend earlier or to seek a right-to-sue letter earlier was a tactical litigation decision. Indeed, the parties filed a joint Federal Rule of Civil Procedure 26(f) pretrial report that noted the pending state claims, but nonetheless said, "The parties do not anticipate amending the pleadings." A litigation decision to pursue claims in another forum without seeking a stay in federal court is not good cause for seeking leave to amend after the deadline to do so.

The defendants also assert that had the motion to add the new claims been granted, they would have needed additional discovery and therefore been prejudiced. The FMLA claim concerned only the use of leave, while the disability claim dealt with mental health and the Title VII claim concerned Arrigo's pregnancy. The defendants would have needed additional depositions of employees, many of whom are no longer with the company, regarding how they were treated in instances of disability and pregnancy. The discovery on damages also would have been different, as FMLA damages don't include emotional distress and punitive damages, while ADA and Title VII claims do. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 n.6 (9th Cir. 2003); *Cianci v. Pettibone Corp.*, 152 F.3d 723, 728–29 (7th Cir. 1998). We decline to set aside the district court's decision denying leave to amend to add claims after the deadline.

### C.  Dismissal of Second Lawsuit

After the district court denied Arrigo's motion for leave to amend to add Title VII and ADA claims, she filed a new lawsuit asserting those same claims. Arrigo contests the district court's dismissal of this second suit. We review a district court's grant of a motion to dismiss de novo. *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016).

Arrigo argues that the district court dismissed her second lawsuit on res judicata grounds and that doing so was improper because there was not a final judgment on the merits. Res judicata, and in particular claim preclusion, bars claims that were litigated or could have been litigated in a previous proceeding when three elements are met: (1) identity of the parties or their privies between the two actions; (2) a final

judgment on the merits in an earlier proceeding; and (3) iden-tity of the causes of action. *Palka*, 662 F.3d at 437. The doctrine "promotes predictability in the judicial process, preserves the limited resources of the judiciary, and protects litigants from the expense and disruption of being haled into court repeat-edly." *Id.*

While our circuit has not yet decided whether the denial of a motion to amend constitutes a decision on the merits for res judicata purposes, other circuits have uniformly found that res judicata applies in such a situation. *Christman v. Saint Lucie Cty., Fla.*, 509 F. App'x 878, 879 (11th Cir. 2013) (un-published); *Hatch v. Trail King Indus., Inc.*, 699 F.3d 38, 45–46 (1st Cir. 2012); *King v. Hoover Grp., Inc.*, 958 F.2d 219, 222–23 (8th Cir. 1992) ("It is well settled that denial of leave to amend constitutes res judicata on the merits of the claims which were the subject of the proposed amended pleading."); *see also, e.g.*, *Huck v. Dawson*, 106 F.3d 45, 49–50 (3d Cir. 1997). Commenta-tors agree as well:

> An order that denies leave to amend the pleadings to advance an additional part of a claim partially asserted might seem to fall within the principle that a plaintiff should be free to bring a second action on a theory that could not be advanced in the first action. It appears well-settled, however, that claim preclusion bars a sec-ond action on the part excluded from the first action. This result is sound. The abstract theory that amend-ment should be freely allowed is widely honored in practice. There is likely to be good reason when the court that has control of the first action concludes that a party should not be allowed to advance matters so

closely related to the action as to be part of a single claim.

18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4412 (2d ed. 2016).

To allow the second lawsuit to continue would render meaningless our decision to uphold the district court's denial of Arrigo's motion for leave to amend to add the same claims. Yet "[i]t is widely accepted that appeal is the plaintiff's only recourse" when a motion to amend is denied as untimely. *Johnson v. SCA Disposal Servs. of New Eng., Inc.*, 931 F.2d 970, 976 (1st Cir. 1991).

The district court's reasoning here was sound:

> … it makes no sense to allow this case to proceed further. Trial in [Arrigo's first lawsuit] is scheduled for May 2014 while trial in [Arrigo's second lawsuit] is scheduled for February 2015. Thus, if I concluded in this order that [the first lawsuit] could not have preclusive effect until judgment was entered in that first case, dismissal of [the second case] would be inevitable, just delayed. Thus, denying defendant's motion on the grounds that no judgment has been entered yet would serve no purpose but to waste more resources of both the parties and the court.

> Moreover, if plaintiff were allowed to litigate a new lawsuit now, it would undermine the decision denying plaintiff's motion for leave to amend her complaint. I denied the motion because it was untimely and would cause unfair prejudice to defendant. Forcing defendant to litigate claims in two different lawsuits proceeding

on different schedules would be even more prejudicial than permitting the untimely amendment.

And to the extent Arrigo is arguing that dismissal was premature for lack of a final judgment, *see Sklyarksy v. Means-Knaus Partners, L.P.*, 777 F.3d 892 (7th Cir. 2015), it is unclear what relief she is seeking. There is now unquestionably a final judgment in the first suit, and as we explained recently in an analogous situation:

> Reversing the district court's dismissal of the 2014 Case would have no practical effect. It is undisputed that at this point, the district court has entered final judgment for defendants. Thus, even if we were to remand the 2014 Case to the district court, the court could simply reissue the same opinion dismissing the 2014 Case based on res judicata. We decline Bell's suggestion that we should use the limited resources of the judiciary in this manner. Therefore, we affirm the district court's dismissal of the 2014 Case.

*Bell*, 2016 WL 3568139, at *6.

Most importantly, allowing Arrigo to proceed here would result in the very prejudice and inefficiency that the denial of the untimely amendment, which we upheld, was intended to avoid. To rule otherwise would undermine the principles animating the doctrines of res judicata and claim splitting, as well as our decision upholding on appeal the denial of the motion for leave to amend. *See Barr*, 796 F.3d at 840–41.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.